JAMES E. HEALD v. THE AETNA LIFE INSURANCE COMPANY OF HARTFORD, CONNECTICUT, Appellant.—104 S. W. (2d) 379.

Division One, April 21, 1937.

1144

*S. J. & G. C. Jones* and *Madden, Freeman & Madden* for appellant.

*Franken & Timmons* and *McAllister, Humphrey, Pew & Broaddus* for respondent.

HAYS, J—This case recently came to the writer by reassignment. It is an action on a policy of accident insurance. In the trial by jury plaintiff had a verdict and judgment for $525. The defendant appealed to the Kansas City Court of Appeals. That court certified its decision to this court pursuant to Article VI, Section 6, Amendment of 1884 of the Constitution of the State, on the ground that such decision was in conflict with decisions of the St. Louis and Springfield Courts of Appeals. In this situation the cause is here for rehearing and determination in like manner as in case of jurisdiction obtained by ordinary appellate process. However, we are at liberty to avail ourselves of such portions or all of the certified opinion as we may choose.

We quote the facts as stated therein, as follows:

"The facts show that the plaintiff was injured on March 22, 1934, while employed in a meat market, owned by one Jack Street and his partner, located in North Kansas City. While splitting a large bone on the meat block with a meat cleaver the cleaver slipped and cut off plaintiff's thumb on his right hand (near the second joint from the tip and had to be disarticulated at that joint). At the time of the injury plaintiff held an accident insurance policy issued by the defendant for the payment of a weekly indemnity in the event insured received accidental injuries which should totally disable him, that is 'wholly and continuously disable insured from date of accident and prevent him from performing any and every duty pertaining to his occupation.' The policy also provided for the payment of one-half of that amount for partial disability, described as injuries that should 'continuously disable the insured from date of accident and prevent him from performing any one or more important daily duties pertaining to his occupation.' It also provided that insured could elect to receive total disability benefits 'in the event of the loss of both hands, both feet or the sight of both eyes,' in lieu of the sums specified for such specific injuries.

"The policy was issued in the year 1925 while plaintiff was operating, as owner, a meat market in Liberty. Insured was described in the policy as owner of a meat market and it stated that his occupation was that of "manager, counter duties, only, not slaughtering or delivering.'

"After his injury plaintiff received indemnity for total disability for eight weeks and four days. The stump of his thumb completely healed over in five weeks and in August, 1934, he returned to the Street meat market in an effort to resume his work. For the first two days he attempted to do everything he had done before, without success. In making fine cuts of meat he was required to grip the meat with the injured hand (he was left-handed). After thirty minutes his hand would cramp, 'quite an acute pain' on account of tenderness in the end of the stump of his thumb and he was required to suspend work. He would rub his hand and massage it or put it under a hot water faucet for five minutes or more, which would relax the cramping condition. He would then work for perhaps half an hour when it would be necessary to repeat the treatment. At night, after coming home from work, he was unable to rest. The pain at night was much worse than when he had not tried to work during the daytime. His disability to perform his work was 'on account of the sensitive condition of the stump of that thumb and the lack of the thumb.' In all, he was at the shop approximately eight days and did not do a full day's work. 'I would have to quit in the evening.'

"Plaintiff testified that the things he did after he returned to work were of a minor nature. He could not trim hamburger, but could grind it. He could grind sausage and keep the case wiped up. He could handle (cut) 'coarse boiling meat or something like that.'

"The evidence shows that in cutting meat it is necessary for the butcher to hold it: 'You have to clamp it to hold it solid or steady to cut it, and if it isn't steady, you can't cut it smooth, the same thinness all the way through. Q. What part of your hand do you use in holding the meat? A. You use a clamp to hold the small pieces or any large pieces, either. You have got to clamp them down. Q. With what? A. Well, with your thumb.'

"Jack Street, one of the proprietors of the meat market, testified that when plaintiff returned to the shop the latter part of August the latter made sausage and hamburger and cleaned up around the place and attempted to cut meat; that the cuts of meats that plaintiff undertook to make were 'very ragged;' that the witness had cuts returned by his customers 'due to the unevenness in the cutting.' The witness further testified that he superintended the meat department.

"Plaintiff testified that his duties at the meat market were confined to the meat department 'cutting steaks, cutting and rolling roasts, cutting chops and waiting on customers'; that he had 'general supervision of the (meat) counter, wait on trade, handling customers. Of course, Mr. Street was always present to take care of anything that I couldn't handle. Q. You also did the buying

for the meat department? A. Yes. The major part of the meat the last two or three years;' that the meat was bought from various packing houses; that he usually bought the meat from the packing-house salesmen who come there; that the buying of meat was a part of his counter duties; that after the loss of his thumb, 'I went there and did as much as I could, the things required of me, but I had a helper all the time where I formerly had a helper only maybe two hours a day. Q. In other words, with your thumb off, you couldn't do all the things you could before? A. By no means. I couldn't do any of them as well and I couldn't do half as many as I could before. Q. Is that right? A. That's right;' that he kept books 'in a way.' 'Q. You could take care of the trade except as to certain of these cuts of meat, couldn't you? A. No, I'll say that I wasn't able to take care of the trade. Q. Well, can you tell me anything you couldn't do for the trade except your inability, you say, to make certain of these cuts of meat? A. Well, that's the business. That is really the thing you do when you work and make those cuts. Q. Answer my question. Could you take care of the trade except insofar as you couldn't make these certain cuts of meat you described? A. No, sir. Q. You could wait upon the customer? A. I could wait upon one where I could formerly wait on five in the same time. Q. Oh, you could handle the trade, but not so well, is that right? A. Handle a limited amount of it.'

"He further testified that he had tried to follow his trade but he knew that he could not do it; that he was still able to buy meat and set the price for it to be sold at retail. 'Q. And as to your superintending duties, directing the activities of the other employees there in the meat department, you can do that despite this accident, couldn't you? A. If there is some one who would give me that kind of position, I might, but I don't know of any . . . Q. You could direct the activities of a helper, for example? A. Yes, sir. Q. And on the counter duties, you could meet the customer and sell them meat, couldn't you? A. Yes, sir. Q. You couldn't preside at the counter and meet the customers and sell them the meat? A. No, sir, I couldn't cut it for them. Q. Leave the cutting out for a moment. I am going to get to that, Mr. Heald. So far as the counter duties are concerned, meeting the customers, discussing the sales and selling, you could do that, couldn't you? A. I could talk with the customer, certainly. Q. And after the meat had been cut, you could wrap up the meat, couldn't you? A. Not very well. Q. You say more slowly than before but you could wrap it up? A. Much more slowly, yes. Q. Now, in addition to this matter of management there, buying, setting price, keeping books and so on that you mentioned do you recall this testimony, "Q. Your duties included not only the physical acts of meat cutting, but as well serving the customer in accordance with his demand?" A. Yes.

Q. So you were not only a meat cutter but in that sense a meat salesman? A. They would go together. Q. Your duties comprehended that you meet the customers at the time, find out from the customer what the customer desired, make suggestions to the customer as to his needs and as to the different cuts of meat that might be appreciated and desirable and cut the meat to their desires? A. Cut it to their order always. Q. Your duties included all of those things? A. Yes."

"Plaintiff further testified that prior to his injury he received a salary of $25.00 per week; that when he attempted to work afterwards he received $15.00. He further testified that he did not think that he really earned that much after his injury.

"Plaintiff's physician testified that the pain in plaintiff's thumb could be relieved by a simple operation of making a small incision above where it is sewed and picking up the nerves and cutting them on each side, but that he would not advise that this be done until a fair trial had been made, over a lapse of time, to effect a cure without the operation; that he would consider a fair trial to be from eight to twelve months."

The petition was drawn on the theory that the facts authorized a recovery as for total disability. The answer controverted that theory and affirmatively pleaded that the facts authorized recovery for only temporary disability for the period from May 22, 1934, to the filing of the answer, amounting to $324.08, which sum defendant tendered and kept the tender good. The plaintiff went to the jury upon instructions presenting his theory and such of the defendant's instructions as presented its theory of partial disability were denied.

The defendant proposes first that the policy provisions are unambiguous; they provide unequivocally that the insured can only recover total disability benefits if the accidental injury "wholly and continuously disable the insured from date of accident and prevent him from performing any and every duty pertaining to his occupation;" that in the absence of ambiguity, as here, the policy must be enforced as written, pursuant to the rule that where the language of an insurance policy is plain and unequivocal there is no room for construction and the words employed must be given their usual and natural meaning. [State ex rel. v. Cox, 322 Mo. 38, 14 S. W. (2d) 600, l. c. 602, 603.] Such is the rule but to that rule there is an equally well settled exception, viz.: If the language is ambiguous, i. e., open to different interpretations, its meaning is to be determined by judicial construction, and in insurance contracts the construction most favorable to the insured must be adopted. [State ex rel. Security Ins. Co. v. Allen et al., 305 Mo. 607, l. c. 614, 267 S. W. 379.] The rule prevailing in this State and in most other jurisdictions is to the effect that a provision such as

the one before us, with respect of the phrase "any and every duty" "would render the contract utterly useless to an assured and would be nothing short, practically speaking, of collecting a premium without rendering a consideration insofar as the total disability clause is concerned" (James v. Casualty Co., 113 Mo. App. l. c. 629); so said provision in this policy must be construed so as to make the provision effective. ██ The rule prevailing in most jurisdictions is that the "total disability contemplated by an accident policy, or the disability clause of a life policy does not mean, as its literal interpretation would require, a state of absolute helplessness; rather, that the disability contemplated means inability to do all the substantial and material acts necessary to the prosecution of the insured's, or, in many instances, any, business or occupation, in a customary and usual manner." [Headnote to Annotations in 98 A. L. R. 789.] The leading cases cited therein from this State are James v. Casualty Co., 113 Mo. App. 622, 88 S. W. 125; Foglesong v. Modern Brotherhood of America, 121 Mo. 548, 97 S. W. 240; Bellows v. Travelers' Ins. Co. (Mo.), 203 S. W. 978.

In this State, in the decisions just cited and in subsequent decisions of our Courts of Appeals, the essence of the rule of construction as stated above has been restated and applied in several forms of expression, according as the facts in judgment appeared to require, as will later be more particularly shown.

Defendant's counsel concede, in their brief in this court, that the phrase "any and every duty" is construed "'judicially to mean 'any and every *substantial* duty.'" But, nevertheless, they insist that the construction thus placed upon the total disability clause would permit a recovery for total disability on facts which under the policy are clearly specified as constituting only partial disability as prevention of performance of "one or more important daily duties pertaining to the occupation." Since the language of the policy as written does not admit of such a result, resort must be had to additional rules for application. One such rule is that the policy should be so construed and harmonized as to give effect to both of the provisions so far as their language will reasonably permit.

██ We are of opinion that disability might prevent the insured from performing substantially an occupation, or be practical inability to do all those substantial and material acts and duties characterizing and pertaining to the occupation in its entirety, without amounting to an inability to do "one or more important daily duties pertaining to the occupation," and that the provision for partial disability has a meaning distinctly different from the correct construction which we have judicially given to the provision for total disability. Thus the provisions may be brought into harmony in the same degree as they were as originally written. They were

correlative and harmonious. It is not permissible to change such correlation by the substitution so made in the total disability provision, in order to make that provision valid, without giving to the partial disability provision a legal effect that will preserve the correlation and harmony formerly existing between them. The Supreme Court of Tennessee in Harrison v. Provident Life & Accident Ins. Co., 70 S. W. (2d) 24, had before it disability indemnity clauses identically the same, and the same contention in regard thereto as in the case at bar, and placed the same construction upon them we have just given. The court concluded the opinion as follows:

"The point was expressly made and determined against the contention of the insurer in Fitzgerald v. Globe Indemnity Co. (California District Court of Appeals; hearing denied by the Supreme Court), 84 Cal. App. 689, 258 Pac. 458, 461, wherein the court said: 'No logical reason appears, however, why the same rule should not be applied where the policy provides for both total and partial disability in order to make the total disability clause "operative and to prevent a forfeiture" of the indemnity provided by that clause. In either case a literal interpretation of the total disability clause would defeat the very purpose of insurance against total disability, because it rarely happens that an insured is so completely disabled that he can transact no business duty whatever. The rule quoted has been applied in many cases where the policy in suit provided for both total and partial disability. (Citing cases.)' "

On the merits the defendant offered, and the court refused to give, several instructions presenting defendant's theory of partial disability, by stating that plaintiff was "only partially and not wholly disabled if he was able to perform *any one* of the substantial duties pertaining to his occupation," and directing a finding for defendant upon a finding that plaintiff was partially disabled as thus defined. For the reasons already indicated those instructions were properly refused.

The plaintiff's main instruction, after hypothesizing all preliminary and essential matters, authorized a verdict for plaintiff for the amount sued for, upon the hypothesis that said injuries "have prevented him from performing substantially his occupation." This instruction was supplemented by two definite instructions, No. 2 given at the instance of plaintiff and No. 3 at the defendant's instance, as follows:

"2. The court instructs the jury that the term 'wholly disabled' as used in these instructions, does not mean that plaintiff was rendered absolutely and literally unable to perform any part of his occupation but it means that he was disabled from performing substantially his occupation.

"3. Disability from performing, substantially an occupation, as used in these instructions, means substantial or practical inability to do those substantial and material acts, and duties characterizing and pertaining to the occupation and necessary to the carrying on of the occupation."

The defendant also offered an instruction lettered "O" as follows:

"Disability from performing substantially an occupation, as used in these instructions, means substantial or practical inability to do all those substantial and material acts and duties characterizing and pertaining to the occupation."

This was refused, but the refusal was of no consequence in the situation. It will at once be seen by comparison that this instruction is substantially the same as defendant's Instruction 3 immediately above. Thus the law precisely as invoked by the defendant was placed before the jury and, of course, it matters not at which party's instance the instruction was actually offered. So, after all, the defendant thus again adopted plaintiff's theory regarding the total disability provision.

The same is also identical with that contained in the James case, supra. This we think sufficiently disposes of this branch of the case. However, it is necessary to briefly refer to a few of the subsequent decisions and particularly those assumed by the certification of the present case to be in conflict with it. (However, we shall not undertake to go into the facts involved, as in none of them are they similar to those in the present case.)

In the Bellows case, supra, the opinion referred to the James case as "a leading and excellently considered case on the subject" and quoted copiously therefrom, and held (by approving plaintiff's instruction at page 984) that the phrase "any and every kind of duties pertaining to his occupation" means "substantially disabled from attending to the duties of his occupation." The court pointed out that "substantial" means essential. However, it is well enough to note that the case was decided by this court en banc and the opinion did not have the concurrence of a majority of the judges, except as to the result. So that the question now under consideration is an open one, so far as the decisions of our court are concerned. Yet that decision is of instructive value which may properly be availed of.

The conclusion in the James case, supra, was "that the disability meant is a disability as to the performance of any substantial part of the business. . . . We therefore hold the contract to mean, not that the insured was rendered absolutely and literally unable to perform any part of his occupation, but that he was *disabled from performing substantially the occupation stated in the policy*."

Taking up now the question of conflict in the decisions rendered subsequently to those noted herein above as cited in the Bellows

case, supra: In Frost v. Central Business Men's Assn. (Mo. App.), 246 S. W. 628, it was held to be a question for the jury to say whether the insured was substantially disabled from attending to the duties of his occupation, since the things he was said to have done were merely nominal or trivial in their character.

Rickey v. N. Y. Ins. Co., 229 Mo. App. 1226, 1242, 71 S. W. (2d) 88, one of the alleged conflicting cases, was expressly ruled upon the authority of the James case.

Another of such, Kane v. Metropolitan Life Ins. Co., 228 Mo. App. 629, 654, 75 S. W. (2d) 826, held that total disability exists "when insured is no longer able to perform the usual, customary and substantial duties of his occupation." That case came to this court on our writ of certiorari where, upon the hearing, the writ was quashed. [State ex rel. Metropolitan Life Ins. Co. v. Allen et al., 337 Mo. 535, 85 S. W. (2d) 469.]

And the remaining one of such, Stahl v. American Natl. Assur. Co., 70 S. W. (2d) 78, applies in the usual manner the rule of construction formulated in the James case.

In Katz v. Union Central Life Ins. Co., 226 Mo. App. 618, 44 S. W. (2d) 250, the gist of the decision was expressed as follows: "Applying those general rules of construction" (citing Corpus Juris), the court held, "it was a question for the jury to decide whether or not the plaintiff had become, and still was, incapacitated from performing *any* substantial part of his ordinary duties, thereby presenting a case of total disability, even though he was still able to perform a few minor duties." (Our italics.)

The case of Buis v. Prudential Life Ins. Co., 229 Mo. App. 190, 77 S. W. (2d) 127, insofar as pertinent here, was ruled upon the authority of the Katz case and under identically the same definitive rule as applied therein. So in that respect both of those cases are in the same category. We are of opinion that those cases were correctly decided on the facts, but we think that the governing principle or rule was incorrectly stated. It is not in harmony with the other decisions reviewed herein, or any other Missouri decision so far as we are advised. That expression of principle is found in Young v. Travelers' Ins. Co., 80 Me. 244, l. c. 247, 13 Atl. 896, a leading case but not widely followed in other jurisdictions in that respect. Nor did the James case follow it, as has been seen above, though it cited the same. Moreover, the author of the Bellows opinion, after discussing the Young case, expressly declined to so interpret it and to follow it. So it is well for the plaintiff, whose counsel have argued in support of that incorrect statement of the law, that his case was not predicated upon it in the instructions given.

█ Considering now the nature and characteristics of plaintiff's business or occupation and the extent of his disability to carry it on, as determinative of the propriety of the trial court's denial of the

defendant's demurrer to the evidence: It was not a double occupation, though defendant claims it was, composed of the separate functions of manager and meat cutter; of which two functions that of manager was predominant, and that of meat cutter at the most subsidiary. It is clear, we think, the business or occupation was a unit, involving interrelated duties, to be normally carried on by the performance of all the substantial duties involved in it. All in all, meat cutting was the distinctive and predominant duty to which all the others were more or less incidental. Those which the evidence showed he could still perform we arbitrarily divide into two groups: (a) He could purchase the necessary carcasses, or sections thereof, look after the department, supervise the part-time helper if necessary (who was a meat cutter of twelve years' experience), and make coarse cuts of meat for sausage and of meat for boiling; (b) he could keep the books or necessary records, grind sausage and hamburger, wrap packages, clean the counter and clean up around the shop. Those duties appearing in group (a) appear to be substantial, those in (b) clerical in part, the others of lesser grade, and all of them of less importance than those in (a). The predominant and all-important one of all the duties of whatsoever kind was meat cutting.

We therefore hold that the character and extent of plaintiff's performance, or more correctly, the extent of his ability to perform, as shown by the evidence, was, in our opinion, clearly a matter for the jury to determine, and hence the demurrer was properly overruled. The jury made the determination. No error has been found in the record.

The judgment of the circuit court is affirmed.

All concur.