**Laverne STOUT, Plaintiff-Respondent,**

v.

**CENTRAL NATIONAL LIFE INSURANCE COMPANY, Defendant-Appellant.**

**No. 35388.**

Missouri Court of Appeals,
St. Louis District,
Division Three.

March 11, 1975.

Motion for Rehearing or Transfer Denied
April 14, 1975.

William R. Kirby, Carl I. Katzen, St. Louis, for defendant-appellant.

James P. Holloran, St. Louis, for plaintiff-respondent.

SIMEONE, Presiding Judge.

This is an appeal by defendant-appellant, Central National Life Insurance Company from a judgment entered in the Circuit Court of the City of St. Louis on January 17, 1973, upon a jury verdict in favor of the plaintiff-respondent, Laverne Stout, in the amount of $12,007.40 for total disability benefits under an insurance policy issued by Central Life to Mrs. Stout. For reasons hereinafter stated, we affirm the judgment.

Since the appellant's major contention on appeal is the alleged failure of plaintiff to present a submissible case, we will state the facts in the light most favorable to the verdict and judgment and give plaintiff the benefit of all reasonable inferences arising from the evidence, disregarding defendant's evidence except where it favors plaintiff's case. Brown v. Missouri Pacific Railroad Company, 510 S.W.2d 846, 848 (Mo.App. 1974); Pogue v. Metropolitan Life Ins. Co., 107 S.W.2d 144, 149 (Mo.App.1937); Tenkhoff v. New York Life Ins. Co., 191 S.W.2d 1005, 1008 (Mo.App.1946).

This litigation began on April 18, 1972, when Mrs. Stout filed her petition in the Circuit Court of the City of St. Louis, seeking damages for total disability benefits under an income protection policy issued by the defendant. The petition, however, did not allege the corporate entity of the defendant, Central National Life. Issue was joined when the defendant admitted the "existance" [sic] of the policy and denied the other allegations. The answer did not contain any specific negative averment concerning the existence of the corporation. Trial commenced January 15, 1973.

Plaintiff, Laverne Stout, was a long-time employee of National Rejectors Company, having worked there as a "hand assembler" for some twenty-two years. She was a "hand assembler" of coin-receiving and dispensing mechanisms for vending machines. In her work, she assembled small parts using a screwdriver, small pairs of pliers and other tools. The jobs that she held or was required to do required the use of her hands. She was described by her supervisor as a "real good worker." Mrs. Stout had an eighth-grade education, had done only "factory work," had no clerical skills and had never been trained in any field other than factory work. Her jobs required manual dexterity.

In 1964, she applied for and was issued an income protection policy by the defendant-Central National, which provided for monthly benefits in the event of total disability in the amount of two-thirds of her salary, or $250.00 per month. The policy contained a provision waiving premiums during total disability. One of the provisions of the policy which is the subject of this litigation provided:

"The term 'total disability' as used in this policy means the complete inability of the Insured to engage in his regular occupation, except that if the Monthly Indemnity has been paid for twelve months in any period of disability, then for the remaining duration of such period of disability the term 'total dis-ability' as used in this policy means the complete inability of the Insured to engage in any and every gainful occupation for which he is reasonably fitted."

On February 26, 1968, and while the policy was in force, Mrs. Stout was injured when her automobile went over the yellow line in the highway and left the road and came to rest half-way in water. Mrs. Stout was rendered unconscious and when she awoke was "on my knees in the back seat, behind the drivers seat, half unconscious." She was taken first to Jefferson Memorial Hospital and then to St. Luke's Hospital in St. Louis. She was treated by her family physician, Dr. Harold E. Walters. Following this accident, Mrs. Stout was absent from work until June, 1968. She returned to work in June, but discontinued employment in September. Dr. Walters repeatedly made an effort to get her to return to work and did "send her back to work." When she returned, she did "hand assembling," but had "terrible pain"—it started up in "my neck and arms and shoulder and eventually worked down into my back." There were many days she couldn't go in to work. She continued to work until September, 1968, when she discontinued the job. She had applied for and received disability benefits until September 30, 1969, when they were discontinued by the defendant, Central.

Dr. Walters described Mrs. Stout's injuries. In the accident she had been temporarily rendered unconscious and was brought to St. Luke's Hospital, suffering from multiple abrasions and contusions of her head, right shoulder and left hand, and complained of soreness of her right shoulder and back. Following her discharge, she was treated by Dr. Walters and had over 100 office visits. Mrs. Stout suffered sprained, strained and partially torn muscles and ligaments of her neck, shoulder and back. She was placed on pain medication, muscle relaxant medication and given cervical traction. It was Dr. Walters' opinion that Mrs. Stout had partially torn the muscles and ligaments in her neck

and shoulder region, as well as in her low back and that scar tissue developed—"[s]o when you put that type of injured tissue to increased activity or work or stretch, it doesn't stretch . . ." "[M]ore activity or movement tends to bring on more discomfort . . ." Dr. Walters indicated that "increased activity or movement or increased muscle activity or strenuous activity causing the muscles to be stretched more will cause more discomfort." Mrs. Stout testified that she had "terrible pain," and when "I get up in the morning I hurt so bad in the lower part of my back that I walk stooped until after I take a darvon and sit in my chair with heat for an hour or maybe two hours, sometimes."

Dr. Walters was of the opinion that her condition was directly attributable to the February accident and that her condition was permanent. Dr. Walters was asked whether he had an opinion "as to whether or not Mrs. Stout can hold down a job that requires manual dexterity, such as a hand assembler in a factory." Dr. Walters answered:

"It would be my opinion she is not capable of performing any type of work activity that involves strenuous use of her arms, neck or back, which would involve bending, twisting, turning, such as using the muscles that I have described that have been injured."

This was so because "muscles that are the type of soft tissue she has in the muscles . . . become painful whenever they are subjected to this type of activity."

On cross-examination, he testified that: "I think that Mrs. Stout is able to do certain things, she is able to get about and do certain things, and . . . that . . . she was [sic] capable of doing more sedentary types of work that are involved."[1]

And on redirect examination, Dr. Walters was asked whether in "this type of work" [hand assembly work] Mrs. Stout is able to do any of "that type of work." He replied: "I think that if she is involved in an assembly line or production work process where there is—and she would have to move rapidly and move all day long to keep up with a certain production quota, I don't think she could possibly do that."

Mr. Charles Salamone, a rehabilitation counselor with the Jewish Employment and Vocational Service, testified that the Division of Vocational Rehabilitation referred Mrs. Stout to his office to test whether or not she could be successfully employed and hold competitive employment. Mrs. Stout was given certain tests—Wechsler Adult Intelligence Scale, Purdue Pegboard test for dexterity and the Bender Gestalt test. It was found after a three-week evaluation that her level of intellectual functioning was in the "dull-normal" range, and her dexterity averages were "very, very low, well below normal"—in the two percentile, and that there were suggestions of "the presence of obsessive, compulsive features in her personality."

Mr. Salamone concluded that: "It is this counselor's impression that the client is unemployable in any type of setting at the present time. Such an impression is based on the fact that the client is unable to attend work on a regular basis due to her poor health. . . ."

To Mr. Salamone it was doubtful that Mrs. Stout could hold an accounting position and "highly doubtful" that she would be able to operate a switchboard.

In the latter part of 1969, Central National requested Mrs. Stout to be examined by Dr. E. Robert Schultz. His report concluded that: "I no longer feel that she

1. In answer to a question whether she could operate a switchboard or do typing or accounting, Dr. Walters answered: "I think as far as her activity is concerned, as far as her using the muscles of her body is concerned, I think that she is capable of doing mild labor, as, maybe, moving her arm on a switchboard, if it's not too strenuous, or capable of doing more mild physical activity in a work area or work process."

is house confined. I would not think there is any neurological reason creating an incapacity to work. Certainly, she is not totally disabled."

Thereafter, Mrs. Stout was informed by the company by letter that it was discontinuing disability payments and enclosed a check in final payment.

At the close of the plaintiff's case and again at the close of all the evidence, Central moved for a directed verdict on the ground that plaintiff failed to make a submissible case of total disability; and at the close of all the evidence, Central also moved to dismiss, since no legal entity was sued, having failed to name the defendant as a corporation. The trial court overruled the motions, indicating that since the matter of capacity was not raised until after answer, the point was waived, and that since Dr. Walters said on direct examination that Mrs. Stout was totally disabled, a submissible case was made.

The jury returned a verdict for $12,007.-40 for damages, vexatious delay and attorney fees, and judgment was entered.

Defendant's after-trial motion filed on January 30, 1973, was denied. On April 23, 1973, plaintiff was given leave to amend the caption of the petition by inserting after the words "Central National Life Insurance Company," the words "a corporation." And thereafter, defendant's amended after-trial motion was also denied.

On this appeal, Central National contends that (1) the trial court erred in overruling its motion for directed verdict, because the plaintiff failed to prove by substantial evidence that she was totally and permanently disabled to engage in "any and every gainful occupation for which she was reasonably fitted"; and (2) the plaintiff failed to plead and prove the corporate entity of Central National, and hence a verdict

against the "defendant" Central National Life Insurance Company was fatal.

Appellant vigorously contends in its argument that the answer of Dr. Walters to the effect that Mrs. Stout is not capable of performing any type of work which involves the strenuous use of her arms, neck or back—was not responsive to the question whether she could hold down a job that requires manual dexterity, such as a hand assembler in a factory. Central also contends that Mrs. Stout could do sedentary types of work, or mild labor, as maybe moving her arm on a switchboard.

The principal issue on this appeal is whether the plaintiff failed to make a submissible case to prove that she was totally disabled within the meaning of the policy, i. e., "the complete inability of the Insured to engage in any and every gainful occupation for which [she] is reasonably fitted." [2]

■ In determining whether the court erred in overruling the motion for directed verdict, we are governed by the rule which requires us to consider all the evidence viewed in the light most favorable to the plaintiff, to give plaintiff the benefit of all favorable inferences arising therefrom and to disregard the defendant's evidence except insofar as it aids the plaintiff's case. Tenkhoff v. New York Life Ins. Co., supra, 191 S.W.2d at 1008.

■ The issue of "total disability" has been before the courts in numerous cases. It is no longer a debatable question in this state that the provisions of a policy insuring against total disability are to be given a liberal construction and not a literal one. Pogue v. Metropolitan Life Ins. Co., supra, 107 S.W.2d at 149.

Although the parties have not referred us to any case construing the exact language contained in this policy—and our research has disclosed none—our courts

---

**2.** During the first twelve months of total disability, the term means "the complete inability of the Insured to engage in his regular occupation." This provision is not in issue.

have construed similar definitions of "totally disabled." [3]

■ It is well settled in this state that "total disability" does not mean that the insured be absolutely helpless or be inert or bed-ridden or house confined, but it is sufficient if it is shown that the infirmity renders the person unable to perform, in the usual and customary way, substantially all of the material acts of any occupation which his age, training, experience, education and physical condition would fit him for except for the infirmity. Rogers v. Metropolitan Life Ins. Co., supra, 122 S.W. 2d at 7–8, and cases cited therein.[4]

■ Whether an insured suffers from total disability within the meaning of an insurance policy is ordinarily a question of fact. Rogers v. Metropolitan Life Ins. Co., supra, 122 S.W.2d at 9.

Numerous decisions have found that an insured was totally disabled within the meaning of the policy when the insured is unable to perform substantially all of the material duties of any occupation for which his age, training, experience, education and physical condition would fit him for except for the infirmity, even though the insured could perform some work and was not helpless.[5]

■ Under these well-settled principles, we are convinced that Mrs. Stout made a submissible case, that the trial court did not err in overruling the defendant's motion for a directed verdict, and that whether Mrs. Stout was unable to engage in any and every gainful occupation for which she is reasonably fitted was a question properly submitted to the jury.

3. The usual definitions construed by Missouri courts have been: "totally and permanently disabled as the result of bodily injury or disease so as to be prevented thereby from engaging in any occupation and performing any work for compensation or profit," Rogers v. Metropolitan Life Ins. Co., 122 S.W.2d 5, 7 (Mo.App.1938) ; and "unable to engage in any occupation or employment for wage or profit," Burns v. Aetna Life Ins. Co., 234 Mo.App. 1207, 123 S.W.2d 185, 186 (1939).

4. See also Burns v. Aetna Life Ins. Co., supra, 123 S.W.2d at 191; Heald v. Aetna Life Ins. Co. of Hartford, Conn., 340 Mo. 1143, 104 S.W.2d 379, 383 (1937) ; Wiener v. Mutual Life Ins. Co. of New York, 352 Mo. 673, 179 S.W.2d 39, 42 (1944) ; Stoner v. New York Life Ins. Co., 90 S.W.2d 784, 793 (Mo.App.1936) ; Barton v. Metropolitan Life Ins. Co., 103 S.W.2d 889, 891 (Mo. App.1937) ; Pogue v. Metropolitan Life Ins. Co., supra; Gladney v. Mutual Life Ins. Co. of New York, 186 S.W.2d 538, 543 (Mo.App.1945) ; Tenkhoff v. New York Life Ins. Co., supra, 191 S.W.2d at 1010. See Annot., Total Disability or the Like as Referring to Inability to Work in Usual Occupation or in Other Occupations, 21 A.L.R.3d 1155, 1204–1207 (1968).
   The clauses construed by Missouri decisions —unable to engage in "any" occupation would seem to prevent recovery of the insured if he could engage in "any" occupation for compensation and would seem to be more favorable to the insurer than the clause

contained in the policy here—complete inability to engage in any and every gainful occupation for which he is "reasonably fitted."

5. Pogue v. Metropolitan Life Ins. Co., supra. In Rogers v. Metropolitan Life Ins. Co., supra, the insured's "line of work" was mining. He was equipped for nothing but manual labor, had an impaired heart and suffered from lack of wind. Even though the insured was able to work on government relief projects, this court held that a submissible case was made. In Burns v. Aetna Life Ins. Co., supra, the insured suffered injury to his wrist while employed at a meat company. Although the insured could sell newspapers or run errands, whether he was totally disabled within the meaning of the policy was a jury question. In Brown v. Mutual Life Ins. Co. of New York, 140 S.W.2d 91 (Mo.App.1940), whether the insured, a secretary and stenographer, was totally disabled was a jury question even though, after suffering severe burns on her hands, arms and other portions of her body, she returned to her former job and was paid a "meagre wage" which her employer said "she does not earn" due to her physical injuries. In Katz v. Union Central Life Ins. Co., 226 Mo.App. 618, 44 S.W.2d 250 (1931), the insured, a farmer, presented a submissible case for recovery even though after incurring injuries—"resulting from a kick by a mule"—he had performed "small duties" about the farm such as milking one or two cows, handling small sticks of wood and driving his car to town.

Mrs. Stout had for some twenty-two years worked at National Rejectors, as a hand assembler for coin-vending machines. She had an eighth grade education, she had no clerical skills, and her work involved manual dexterity. After the accident of 1968, she had pain in her neck, arms, shoulder and back; some days she could hardly straighten up. Since the accident, she had remained under the care of Dr. Walters, whom she saw some 114 times prior to trial. Dr. Walters characterized the condition of her muscles as permanent, that no improvement was anticipated and that she was not capable of performing any type of work activity that involves strenuous use of her arms, neck or back. Dr. Walters testified that, although she is able to do "certain things" and is "capable of doing more sedentary types of work," she could not "possibly do" "assembly line or production work." Mr. Salamone testified that her intelligence is in the "dull-normal" range, that her dexterity averages are "very, very low, well below normal," and that she is unemployable in any type of setting at the present time, because she is unable to attend work on a regular basis because of her health.

The test is not whether Mrs. Stout is capable of engaging in some other work, or is capable of doing some work such as operating a switchboard, housework or accounting. The test is whether she is unable to engage in any and every gainful occupation for which she is "reasonably fitted" or, in the language of the authorities, whether her condition renders her unable to perform, in the usual and customary way, substantially all of the material acts of any occupation which she would be able to engage in except for her infirmity. Under this test, there was ample evidence to submit the issue of total disability to the jury. Mrs. Stout was engaged in factory work for a great number of years; her factory work involved hand assembling and manual dexterity. Under the evidence adduced, she was unable or incapable of doing assembly line or production work, and because of her age, training, experience, education and physical condition, the jury could reasonably find that she was unable to perform her occupation.

In short, we believe there was sufficient evidence to submit to the jury the issue of whether she was unable to perform substantially all the acts of any "occupation" that she would be able to engage in except for her infirmity, or whether she was completely unable to engage in any occupation "for which she is reasonably fitted."

Defendant places too much stress on the answer of Dr. Walters that Mrs. Stout is not capable of performing any type of activity which involves the *strenuous* use of her arms, neck or back. There was other evidence that she was incapable of performing substantially all of the acts of factory work involving hand assembling and manual dexterity.

Mrs. Stout was reasonably fitted to be a factory worker—a hand assembler. That was the principal business of her life; that was her trade, her craft, her occupation for which she was reasonably fitted, because of her experience, training, education and physical condition. There was sufficient evidence to submit the issue of total disability to the jury.

Defendant also contends that Mrs. Stout might be able to do mild labor. But this is not the test. The test is as stated above.

Defendant places reliance on Smith v. Metropolitan Life Ins. Co., 108 S.W.2d 995 (Mo.App.1937). That case is not dispositive of the issues here. In *Smith,* the court held that, viewing only plaintiff's evidence and all reasonable inferences therefrom, plaintiff "was able to and did perform his regular and usual duties as an employee of the Lead Company without any complaint as to disability." There was evidence that plaintiff even worked "overtime." The court in *Smith* pointed out that, in every case where judgment for a claimant was affirmed, there was evidence from which it could be reasonably inferred that the employee was able to perform his work only by virtue of the assistance of others

or by the exercise of extreme, extraordinary and painful efforts involving grave risks of health and life.

In the case at bar, when plaintiff returned to work in June, 1968, she had "terrible pain" in her neck, arms, shoulder and back. She had a bad absentee record for the three or four months she attempted to work, because there were days when she could hardly "straighten up" and had headaches for which even prescription pain medication gave no relief. Her work was not acceptable. In September, her treating physician advised her to stay home from work. It is apparent to this court that such evidence supplies the very deficiencies for which judgment in *Smith* was reversed. See also Rogers v. Metropolitan Life Ins. Co., supra, 122 S.W.2d at 9, distinguishing *Smith*.

From all of the evidence, viewed in the light most favorable to the plaintiff and under the authorities of our Missouri courts, we hold that a submissible case was made.

■ Defendant's second point—by not pleading the corporate entity of the defendant, the verdict against defendant was fatal—is without merit. Central relies on § 375.256, RSMo 1969, V.A.M.S., but that reliance is misplaced. Central did not object to the failure to plead its corporate status but answered by way of denial. In such instance, when a party desires to raise an issue as to the legal existence of a party or the capacity of a party to sue or be sued, he shall do so by specific negative averment. Rule 55.13, V.A.M.R. Furthermore, plaintiff sought and was granted leave to amend the caption of her pleading after judgment. The trial court permitted the amendment following the rule that leave shall be "freely given when justice so requires." Rule 55.-33; Siedler v. Tamar Realty Company, 491 S.W.2d 566 (Mo.App.1973) [6]; Weil Clothing Co. v. National Garment Co., 148 S.W.

2d 586 (Mo.App.1941). See also Rules 74.-30 and 74.31.

We have examined the entire transcript, read the briefs and authorities by the parties and conclude that (1) the trial court did not err in overruling the motion for directed verdict and in submitting the cause to the jury, and (2) there was no error in permitting an amendment of the petition to include the corporate entity of the defendant.

Finding no prejudicial error, we affirm the judgment.

The judgment is affirmed.

McMILLIAN and GUNN, JJ., concur.

---

6. "A trial judge has broad discretion to permit amendments to pleadings at any stage of the proceedings, even after verdict." Siedler v.

Tamar Realty Company, supra, 491 S.W.2d at 568.